## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:23-cr-20037-MSN |
| | ) | |
| RODNEY BROOKS, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS

Before the Court is Defendant Rodney Brooks's Motion to Suppress, filed May 5, 2023. (ECF No. 30.)  The United States responded in opposition on May 18, 2023.  (ECF No. 35.) District Judge Mark S. Norris referred the motion to the undersigned for report and recommendation on May 12, 2023.  (ECF No. 31.)

The Court held a hearing on July 7, 2023.  (ECF No. 43.)  At the hearing, the United States called one witness, Detective Gary Williams, and introduced into evidence two exhibits: a disc containing a video file of an interview (Exhibit 1) and an advice-of-rights form (Exhibit 2). Brooks called three witnesses, Officer Malcolm DeWitt Smith, Jr., Officer Russell Cathey, and Sergeant Richard Hilliard, and introduced into evidence three exhibits: a disc containing a video file from a body-worn camera (Exhibit 3), a Memphis Policy Department ("MPD") policy statement (Exhibit 4), and a disc containing another video file from a body-worn camera (Exhibit 5).

Following the hearing, the parties submitted additional briefing based on new theories raised by Brooks at the hearing.  Brooks filed a supplemental brief on July 14, 2023 (ECF No.

44), the United States filed a response to that supplement on July 28, 2023 (ECF No. 47), and Brooks filed a reply to the supplement on August 2, 2023 (ECF No. 48).

After careful consideration of the statements of counsel, the testimony of the witnesses, the evidentiary exhibits, and the entire record in this case, the Court recommends that the motion be denied.

## PROPOSED FINDINGS OF FACT

Officers Smith and Cathey are MPD officers with the Tillman Station taskforce. Officer Smith has worked for the MPD for twenty-one years. He testified that it is MPD policy to advise a person of their *Miranda* rights once they are in custody. (*See* Exhibit 4.)

On May 5, 2022, Officers Smith and Cathey, along with other officers, were called to 962 Hudson Street in Memphis, Tennessee, to apprehend Brooks, a suspect in connection with a carjacking on April 26th. Brooks had previously been identified, along with Casey Schmuck, by the victim's girlfriend as responsible for the carjacking. The victim's girlfriend was a close friend of Brooks and was in contact with Brooks to try to get the victim's items back, and she had provided investigators with Brooks's possible location at 962 Hudson. Brooks and Schmuck were identified by the MPD as persons of interest on April 29th. Schmuck was suspected of having the victim's shotgun in his possession.

Officers Smith and Cathey were wearing body-worn cameras, which recorded the interaction. (*See* Exhibits 3 and 5, respectively.) As shown in those recordings, at approximately 10:06 a.m., the officers approach Brooks in a detached garage next to the home. Brooks is standing with an electric razor in his hand and a towel over his shoulder, next to a chair and another person. Multiple witnesses testified that Brooks was cutting someone's hair when the officers approached. Officer Cathey immediately handcuffs Brooks and walks him to the

patrol car, where he is patted down. Officer Cathey asks Brooks if he knows what this is about, and Brooks says no. During the pat-down, Officer Cathey locates a "kit box" in Brooks's pocket, which Officer Cathey offers to throw away. Brooks also describes the other items in his pockets, including a pen and a toothpick. As Officer Cathey continues to search Brooks, Brooks asks for a cigarette.

Officer Cathey sits Brooks down in the backseat of the patrol car, with the door open. Officer Smith then walks up and asks Brooks, "where Casey at, man?" Brooks responds that he has not seen Schmuck since a day or two after "the incident that I guess that's what y'all have got me for." Brooks says that he saw Schmuck at the Z Market, which is where Schmuck hangs around, and that his grandmother lives on Print Street. Officer Cathey testified that he asked Brooks about Schmuck's location because they were trying to apprehend both suspects.

Officer Smith asks Brooks if he has had a hit today, and Brooks says yes, that morning. Officer Smith says that he hopes Brooks can "kick that shit," and Brooks responds, "this is the part of that mission, to help me kick that shit." Officer Cathey then lights a cigarette for Brooks. Officer Smith testified that he asked Brooks about taking drugs because the victim's girlfriend, a long-time friend of Brooks, said that he had been using drugs. Officer Smith also testified that Brooks did not seem lucid during their five-to-seven-minute interaction and only "somewhat" seemed alert and aware of what was going on.

As Officer Smith and Brooks continue to talk, Officer Cathey says to Officer Smith, "tell him, we got to have Casey though." Officer Cathey says to Brooks, "it would be easier for you if we had Casey." Brooks reiterates that Schmuck hangs around the Z Market on Macon and Maria and that he has not seen Schmuck in a week and a half. Brooks also says that Schmuck was hanging out at an abandoned property on Pleasant Cove.

Officer Cathey then gets in the patrol car to transport Brooks to the station.  As they begin to leave, Officer Cathey radios to cancel the transport and says to Brooks, "I want you to take me to Casey, you hear me?  Alright, tell me where to go."  Brooks's response is inaudible, but Officer Cathey indicates he is going to a location on National.  Officer Cathey testified that Brooks knew where Schmuck was but did not know the address, so Officer Cathey asked Brooks to show him the location.  Officer Cathey tells Brooks that he can lay down in the patrol car if he wants to, and he testified that that offer was for Brooks to avoid being seen to protect his safety. Brooks gives Officer Cathey directions as he drives to Schmuck's suspected location.  Brooks also reiterates that Schmuck has been staying at the house on Print.  Officer Cathey arrives at a location, asks an individual if Schmuck is there, and leaves his contact information with the individual to call if Schmuck comes back.

After learning that Schmuck was not at the location, Officer Cathey suggests that Schmuck will be found at the Print house and says he will go to that house.  As he drives, Brooks continues to give directions.  Brooks asks if he is going to get charged, and Officer Cathey says both of them will get charged, but Schmuck was the one who did the act.  Officer Cathey tells Brooks he does not want to get into the facts of the incident because he had not read him his rights.  As Officer Cathey's patrol car approaches Print, Brooks points out Schmuck's grandmother's house.  Leaving Brooks in the car, Officer Cathey and other officers approach the home, and Schmuck is taken into custody.  Officer Cathey testified that they did not find the stolen shotgun when they arrested Schmuck; officers went back to recover it from the Print house after interviewing Schmuck based on information Schmuck provided.  Officer Cathey gets back into the patrol car and tells Brooks, "good job, Rodney."

Officer Cathey then transports Brooks to the station, to the violent crimes unit. Officer Cathey testified that, during the trip, Brooks asked him a couple of times about smoking a cigarette. They arrive at the station around 10:48 a.m.

Officer Cathey testified that Brooks was able to answer all of his questions and was very current and coherent. During the drive, Officer Cathey asked Brooks if he had information about other individuals he was looking for in unrelated investigations, and he testified that Brooks was able to talk to him about that as well.

At 11:36 a.m., at the violent crimes unit facility, Detective Williams and Sergeant Hilliard interviewed Brooks. Sergeant Hilliard testified that, prior to the interview, he received a telephone call saying that Brooks and Schmuck were in custody, but he did not discuss any details. Detective Williams testified that Brooks was brought directly to him after he was apprehended, which is when they began the interview.

Detective Williams has worked for the MPD since June 2009. He is currently assigned to the violent crimes unit, where he has worked since January 2019, investigating carjacking robberies and interstate shootings throughout the city of Memphis. Last year, his unit investigated over 400 carjackings. Sergeant Hilliard has worked for the MPD for fifteen years.

Detective Williams has interviewed numerous defendants, witnesses, and victims in his career. For suspects, he utilizes a standard procedure: two investigators sit down with the suspect in a private room with body worn cameras used to audio and video record the interaction. The investigators give the suspect an advice of rights form that lists the *Miranda* rights. The investigators allow the suspect to read over the rights and initial each one to show understanding, and they answer any questions the suspect has. If the suspect understands his or her rights and wants to speak with the investigators, the suspect prints and signs his or her name on the form,

and the investigators sign as well.  Once the waiver form is signed, the investigators begin

questioning the suspect about the incident.  Detective Williams testified that it is normal for

suspects to contemplate whether to share their story.

Detective Williams testified that, during the interview, Brooks seemed calm, alert, and

sober and that nothing gave him pause to interview Brooks.  Exhibit 1 contains the recording of

this interview.  The video shows Brooks, Detective Williams, and Sergeant Hilliard sitting

around a table in a small room with the door closed.  Sergeant Hilliard asks Brooks if he is tired;

Brooks says no.  Detective Williams says, "I think you already know why you're down here; we

want to try to get your side of it, okay?"  Brooks responds that he does not want to give a

statement about the situation or help the investigators with their cases.  Detective Williams

clarifies that he and Sergeant Hilliard are not investigating drug cases and want to talk about the

April 26th incident.  Detective Williams asks Brooks, "do you know what I'm talking about?"

and Brooks nods his head and says "uh-huh."  After a few seconds of silence, Detective Williams

says, "you're looking kind of confused," and Brooks says, "I don't have nothing to say about that

situation."  Detective Williams tells Brooks that there is more than one side to every story and

that he wants to give everyone an opportunity to tell their side.  Sergeant Hilliard adds that he

believes there is "more to what happened than what happened," based on his investigation and

"talking to some of the people that we've talked to," and he tells Brooks that this is his

opportunity.  Brooks responds that it is not going to help him, and Sergeant Hilliard says, "you

don't know that.  You might tell me something that I don't know . . . that can waiver one way or

the other."  Sergeant Hilliard says, "we didn't issue a warrant for you and do all that, you know?

We brought you in here to give you this opportunity.  If we wanted to put you in jail, man, we

would have just thrown you in jail."  Brooks responds, "they said I'm still going to jail," and

Sergeant Hilliard says, "you probably are still going to jail, I'll be honest with you. I'm not going to lie to you. But, you know, it, what you have to say may waiver one way or the other. Right now I'm looking at carjacking and employment of a firearm. That's pretty hefty-ass charges." Brooks says, "I didn't have no firearm." Sergeant Hilliard says, "there's a big difference between that and a theft. That's why you're here, you get this opportunity." Brooks says, "what do you want to hear?" and Detective Williams responds that they want to hear his side of what happened. Detective Williams testified that he commonly has to go back and forth with a suspect in this way.

At this point, around five and a half minutes into the video, Detective Williams says that, before they can hear Brooks's side, they have to make sure he understands his rights. Detective Williams begins to fill out the waiver form, asking Brooks his birthday and address, which he provides. When asked his highest level of education, Brooks says "ninth grade" at Treadwell High School. Brooks confirms that he grew up in Mitchell Heights and explains that his family moved to the neighborhood from Aurora, Illinois, near Chicago. Brooks states that he has two children, a nine-year-old boy and a younger girl, and the three men discuss raising children, with Brooks laughing and smiling. Detective Williams testified that this back-and-forth is how the investigators interact with people and build rapport. He also testified that Brooks gave no indication that he was under the influence at that time or that he did not understand what was happening.

Brooks then confirms that he can read and write, and Detective Williams gives the waiver form (Exhibit 2) to Brooks to read and tells him to ask any questions. Brooks reads the form, listing the *Miranda* rights, out loud. Brooks's speech is fairly clear and understandable, though somewhat slurred. He is able to easily read the form and says he understands and has no

questions.  He then initials the form and reads the concluding paragraph.  Detective Williams

asks Brooks if he knows what "coercion" means, and when Brooks says no, Detective Williams

defines the term, telling Brooks that he cannot and will not threaten Brooks to get him to talk.

Brooks confirms that he understands and shakes his head when asked if he has any questions.

Detective Williams testified that, in his experience, few people are aware of what coercion is,

which is why he asked Brooks.  He also testified again that Brooks gave no indication that he did

not understand what was happening.

Detective Williams then tells Brooks to sign and print his name if he is willing to talk to

them.  Brooks hesitates for about fifteen seconds, saying, "oh man, man, man."  Detective

Williams tells Brooks that, if he starts answering questions now, he can stop at any time.

Detective Williams testified that sometimes people are apprehensive about talking because they

think they have to answer everything once they sign the form, and he is used to observing that

kind of contemplation.  Brooks asks, "is this what you want though?  You want my story?" and

Detective Williams says yes.  Brooks then signs the form, while asking for a cigarette.  Detective

Williams says he will try to find one.  Detective Williams testified that, in his opinion, Brooks

understood the document he signed and had no indication that Brooks was impaired at all.

Sergeant Hilliard then asks Brooks whether he uses drugs, and Brooks responds,

"fentanyl, full-time junkie."  He says he has been on drugs for ten years—at first heroin, then

fentanyl for the last three years.  Brooks says he is trying to get off it and says he has not

overdosed on it.  Sergeant Hilliard says, "we're not the dope police but I can tell you that we

want you to get clean because we want you to be there for your kids."  The three men then

discuss Brooks's children, his family, and his drug use.  Brooks says that he spends $40 a day on

fentanyl.  The investigators remark that Brooks could afford a nice house for what he spends on

fentanyl. Brooks says that everyone in his family knows about his drug use. He discusses trying to get off fentanyl, including through rehab, and says he was successful for seven to ten days, which made him sick and sent him to the hospital. Brooks explains that he is ready to go to jail because it would help him get off the drugs, though he also discusses that drugs can be easier to obtain in jail than on the streets. Detective Williams testified that, even after this discussion about Brooks's drug use, he did not believe Brooks was impaired in any way. During this conversation, Brooks sits hunched over and speaks quietly, though he is communicative and responsive to the investigators' questions.

About nineteen minutes into the video, Sergeant Hilliard asks Brooks where he was arrested, and Brooks says at his "baby-mama's" house, on the corner of Kearns and Hudson, outside in the backyard while he was cutting someone's hair. Brooks explains that he had been trying to work with the dope police for about a week and had wanted one last hit before he went to jail. He says he knew the victim's girlfriend had called the police but thought he had more time before he would be arrested.

Brooks then discusses the April 26th incident. He says that he and Schmuck had a plan to get the weapon out of the vehicle, but then Schmuck jumped in the vehicle. He says they wanted the weapon for protection and they thought the victim had weapons in the vehicle. Brooks says Schmuck got a shotgun—Brooks did not want a firearm because he is a convicted felon and did not want to go back to jail. He indicates he was on drugs the night of the incident. Brooks confirms that he is close with the victim's girlfriend, like a big brother, and discusses her involvement. Brooks says that the victim was able to get many of his personal items back after the incident, though he and Schmuck sold the tools they found in the car. He provides more details about the incident and the relationship between the victim and his girlfriend. The

investigators conclude the interview at 11:58 a.m. and say they will try to find a cigarette for Brooks.  Brooks also asks for a piece of candy.

Detective Williams testified that he believed Brooks was not too impaired or uncomfortable during this discussion, that Brooks was fully aware of the circumstances, and that Brooks was being truthful.  He testified that, in his work, he comes into contact with people who are intoxicated on drugs or alcohol and is aware of the signs of intoxication.  Based on his observation of Brooks that day, Detective Williams testified that Brooks did not show signs of intoxication.  Sergeant Hilliard likewise testified that Brooks did not seem impaired, was alert, and appeared to understand the questions asked of him, and Sergeant Hilliard did not get an indication that Brooks was not lucid or did not know what he was talking about.  Neither Detective Williams nor Sergeant Hilliard asked Brooks if he was under the influence during the interview.

Detective Williams testified that, after this interview, the investigators went to talk to Schmuck. Sergeant Hilliard testified that the only information Schmuck gave the investigators was the location of the shotgun.

After the hearing on the motion to suppress, Brooks submitted the Sworn Declaration of Race Bennett.  (ECF No. 48-1.)  The declaration states that Bennett, an investigator for the Federal Public Defender's Office, spoke with Kelsie Brunner on August 2, 2023.  (*Id.* ¶¶ 2, 3.) Brunner relayed that she has had a relationship with Brooks for many years, that they are no longer involved, and that they have a young child together.  (*Id.* ¶ 5.)  Brunner further stated that Brooks "would stay part of the time at my house, on Hudson, and part of the time with his grandmother."  (*Id.* ¶ 6.)

On February 23, 2023, a federal grand jury returned an indictment charging Brooks with one count of knowingly possessing a firearm while having previously been convicted of a crime punishable by imprisonment for a term exceeding one year in violation of 18 U.S.C. § 922(g)(1) and one count of knowingly possessing a stolen firearm in violation of 18 U.S.C. § 922(j).  (ECF No. 1.)

## PROPOSED CONCLUSIONS OF LAW

Brooks seeks suppression of statements he made during the interview at the violent crimes unit, arguing they are the fruits of an illegal arrest, the fruits of a prior involuntary interrogation, involuntary based on Brooks's mental state, and the product of coercive and illusory promises.

**I.    The Impact of the Warrantless Arrest on the Admissibility of the Statements**

Brooks argues that his arrest was illegal because officers entered the backyard of Brunner's home to conduct the warrantless arrest.  "Unreasonable searches or seizures conducted without any warrant at all are condemned by the plain language of the first clause of the [Fourth] Amendment." *Payton v. N.Y.*, 445 U.S. 573, 585 (1980).  "[T]he warrantless arrest of a person is a species of seizure required by the Amendment to be reasonable." *Id.*  "[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Id.* at 585–86 (quoting *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 313 (1972)).  As such, "searches and seizures inside a home without a warrant are presumptively unreasonable," and, absent exigent circumstance, the warrantless entry into a home to arrest a resident is unconstitutional "even when a felony has been committed and there is probable cause" to arrest. *Id.* at 586, 588–89 (citing *Dorman v. Unites States*, 435 F.2d 385 (D.C. Cir. 1970) (en banc), as "persuasive and in accord with this Court's Fourth Amendment decisions").  A detached garage

can be considered within the curtilage of a home entitled to Fourth Amendment protection, *see United States v. May-Shaw*, 955 F.3d 563, 569, 571 (6th Cir. 2020), and the United States does not contest that the officers found Brooks within the curtilage of 942 Hudson.

The United States raises the initial argument that Brooks lacks standing to challenge the arrest because he had no reasonable expectation of privacy in the residence or its backyard. "Fourth Amendment rights are said to be 'personal,'" and "[s]o a defendant must show that 'his own' rights were 'infringed.'" *United States v. Russell*, 26 F.4th 371, 374 (6th Cir. 2022) (quoting *Rakas v. Illinois*, 439 U.S. 128, 133 (1978); *Byrd v. United States*, 584 U.S. –, 138 S. Ct. 1518, 1526 (2018)). "Courts use 'standing' as a 'shorthand' for this requirement." *Id.* (quoting *Byrd*, 138 S. Ct. at 1530). "[A] defendant has standing only if he has a Fourth Amendment interest in the property searched," which "can either be a property or a privacy interest." *Id.* at 377 (citing *Byrd*, 138 S. Ct. at 1530). "[W]e must determine first, whether he had an actual, subjective expectation of privacy, and second, whether that expectation was a legitimate, objectively reasonable expectation." *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979); *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000)). The defendant bears the "burden of establishing standing to assert a Fourth Amendment violation." *Id.* (citing, e.g., *United States v. Salvucci*, 448 U.S. 83, 86 (1980)).

"A person's 'status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable.'" *United States v. Allen*, 720 F. App'x 254, 257 (6th Cir. 2018) (citing *Minn. v. Olson*, 495 U.S. 91, 95 (1990)) ("People—whether renters, couch surfers, or nomads—have a reasonable expectation of privacy in places that function as home."). That expectation may be reasonable regardless of

whether the defendant spent the night immediately preceding the search at the home. *See United States v. Pollard*, 215 F.3d 643, 647–48 (6th Cir. 2000) (finding standing where the defendant "had been staying at the home earlier in the week," "occasionally spent the night at the residence and kept some personal belongings in a closet," "sometimes ate meals with the family during his visits," and "was allowed to stay in the home even if the residents were not present"); *see also United States v. Ellis*, 125 F. App'x 691, 696 (6th Cir. 2005) (finding that, where the property at issue was "one of two places where [the defendant] stayed and that 'he spent a few nights'" there, "it seems that [the defendant] fits within the ambit of the overnight guest," and thus "it seems appropriate to conclude that [the defendant] had a legitimate expectation of privacy" in the property).

The parties do not dispute that 942 Hudson is Brunner's home, not Brooks's. The United States argues that the record does not establish that Brooks was an overnight guest or "anything more than a transient visitor." (ECF No. 47, at 4–5.) After the United States made that argument, however, Brooks submitted the declaration indicating that Brunner told defense counsel's investigator that she "had a relationship with Rodney Brooks for many years," that they "are no longer involved," that they "have a young child together," and that "Brooks would stay part of the time at my house, on Hudson, and part of the time with his grandmother." (ECF No. 48-1.) Though the propriety of Brooks's late submission of this hearsay evidence via declaration is questionable, the United States has not objected to it, and thus the Court will consider it. *See, e.g.*, *United States v. Stepp*, 680 F.3d 651, 668–69 (6th Cir. 2012) (recognizing the trial court's discretion to consider—or reject—evidence at a suppression hearing that would not be admissible at trial). Brooks has thus presented some evidence that he was an at-least-occasional overnight guest at 942 Hudson. As such, under *Pollard*, based on the record currently

before the Court, Brooks had a sufficiently reasonable expectation of privacy enabling him to challenge his warrantless arrest there.

Brooks next argues that the United States has identified no exigent circumstances that would justify his warrantless arrest.  Indeed, the United States offers no such argument, asserting only that the officers had probable cause for the arrest—a position Brooks does not challenge—which is insufficient to render his arrest constitutional in the absence of a warrant.  *See Payton*, 445 U.S. at 588–89.

The suppression issue thus turns on whether the presumptively unconstitutional warrantless arrest of Brooks in the curtilage of a home in which he had a reasonable expectation of privacy should result in suppression of statements he made after arrest.  The United States relies on *New York v. Harris*, in which officers entered the defendant's home to arrest him without his consent and without a warrant, but with probable cause.  495 U.S. 14 (1990).  The *Harris* Court declined to apply the exclusionary rule to the defendant's subsequent *Mirandized* confession made later at the station house.  *Id.* at 17.  The Court explained that "the rule in *Payton* was designed to protect the physical integrity of the home; it was not intended to grant criminal suspects, like Harris, protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime."  *Id.*

In *Payton*, an opinion addressing two different cases, the officers who entered the defendants' homes to conduct the arrests also seized evidence from inside the homes (in one case, shell casings in plain view, and in the other, weapons and narcotics in a chest of drawers in the defendant's immediate area).  445 U.S. at 577–78.  In *Harris*, the Court limited *Payton*'s application to the seizure of such evidence from inside the home:

> Nothing in the reasoning of that case suggests that an arrest in a home without a
> warrant but with probable cause somehow renders unlawful continued custody of

the suspect once he is removed from the house. There could be no valid claim here that Harris is immune from prosecution because his person was the fruit of an illegal arrest. Nor is there any claim that the warrantless arrest required the police to release Harris or that Harris could not be immediately rearrested if momentarily released. Because the officers had probable cause to arrest Harris for a crime, Harris was not unlawfully in custody when he was removed to the station house, given *Miranda* warnings, and allowed to talk. For Fourth Amendment purposes, the legal issue is the same as it would be had the police arrested Harris on his doorstep, illegally entered his home to search for evidence, and later interrogated Harris at the station house. Similarly, if the police had made a warrantless entry into Harris' home, not found him there, but arrested him on the street when he returned, a later statement made by him after proper warnings would no doubt be admissible.

495 U.S. at 18 (internal citation omitted). Thus, "the station house statement in this case was admissible because Harris was in legal custody [because officers had probable cause to arrest him] . . . and because the statement, while the product of an arrest and being in custody, was not the fruit of the fact that the arrest was made in the house rather than someplace else." *Id.* at 20.

In other words, assuming the officers illegally arrested Brooks in the curtilage of Brunner's home, the remedy for that violation would be suppression of any evidence the officers obtained in the home. *See id.* ("The warrant requirement for an arrest in the home is imposed to protect the home, and anything incriminating the police gathered from arresting Harris in his home, rather than elsewhere, has been excluded, as it should have been . . . ."). The United States seeks to admit no such evidence in this case. Under *Harris*, the statements Brooks later made at the violent crimes unit are beyond *Payton*'s reach, and thus the illegality of the arrest is irrelevant to the admissibility of those statements.[1]

---

[1] Because Brooks does not contest that the officers had probable cause to arrest him, his attenuation argument regarding the arrest is inapposite. (*See* ECF No. 44, at 7–9.) Attenuation looks to how close the relationship is between officers' illegal conduct and the fruits of that illegal conduct. *Harris*, 495 U.S. at 19. As the *Harris* Court explained, "that attenuation analysis is only appropriate where, as a threshold matter, courts determine that 'the challenged evidence is in some sense the product of illegal governmental activity.'" *Id.* (quoting *United*

The parties both cite *United States v. Watson*, 489 F. App'x 922 (6th Cir. 2012), but that case does nothing to alter the application of *Harris* in this case. In *Watson*, officers developed probable cause to search a residence for narcotics. *Id.* at 923. While waiting on a search warrant, an officer went to the home to "secure evidence," and, through a screen door, smelled marijuana and saw the defendant inside. *Id.* at 924. The officer opened the screen door, stepped inside, and arrested the defendant, who was then taken to the sheriff's department where he gave an incriminating statement. *Id.*

The court first held that the officer's entry into the home was not justified by exigent circumstances and thus was unconstitutional under *Payton*. *Id.* at 926. The court then found *Harris* distinguishable because the arrest was conducted without probable cause:

> The *Harris* court's holding is premised on the existence of probable cause to arrest prior to entry into the home. . . . Officers did not enter [the] home with the intent to arrest Watson; they instead entered for the purposes of securing evidence. Given that officers only had probable cause to search [the] home but lacked probable cause to arrest Watson, *Harris* does not control.

*Id.* The post-arrest statements in *Watson* were therefore fruit of that illegal arrest and not admissible. *Id.*

The factual premise that distinguished *Harris* from *Watson* renders *Harris* directly applicable in this case. In this case, as in *Harris*, there is no dispute that the officers had

---

*States v. Crews*, 445 U.S. 463, 471 (1980)). And, per *Harris*, in cases like the one at bar, the challenged evidence (the station house confession) is the product of legal police conduct (arrest with probable cause), not fruit of the illegal entry into a home without a warrant. In other words, the arrest of Brooks was not illegal, and the station house statements were the fruit of that arrest, not of the illegal entry into the home, and thus any attenuation or lack thereof between the arrest and the statements is irrelevant.

probable cause to arrest Brooks.  Thus, unlike in *Watson*, the arrest was legal and did not render

the subsequent stationhouse statements impermissible fruit.[2]

## II.    The Knowing and Voluntary Nature of the Statements

The Fifth Amendment provides that no person "shall be compelled in any criminal case

to be a witness against himself."  U.S. Const. amend. V.  "To protect this right, *Miranda* requires

police officers to warn suspects taken into custody of the right to remain silent and the risk of

speaking without a lawyer present, along with other warnings."  *United States v. Woolridge*, 64

F.4th 757, 759–60 (6th Cir. 2023) (citing *Miranda v. Ariz.*, 384 U.S. 436, 478–79 (1966)).  "A

suspect may waive his *Miranda* rights only if 'the waiver is made voluntarily, knowingly and

intelligently.'"  *Hill v. Shoop*, 11 F.4th 373, 425 (6th Cir. 2021) (quoting *Moran v. Burbine*, 475

U.S. 412, 421 (1986)).  To be voluntary, the waiver must be "the product of a free and deliberate

choice rather than intimidation, coercion, or deception."  *Id.* (quoting *Moran*, 475 U.S. at 421).

To be knowing, the waiver must be "made with a full awareness of both the nature of the right

being abandoned and the consequences of the decision to abandon it."  *Id.*  Both inquires are

determined under the totality of the circumstances.  *Id.*  The United States bears the burden of

---

[2] The US also argues that the independent source and inevitable discovery doctrines preclude
application of the exclusionary rule in this case.  *See United States v. Leake*, 95 F.3d 409, 412
(6th Cir. 1996) ("Under the independent source doctrine, evidence will be admitted if the
government can show it was discovered through sources wholly independent of any
constitutional violation. . . .  Under the inevitable discovery doctrine, evidence may be admitted
if the government can show that the evidence inevitably would have been obtained from lawful
sources in the absence of the illegal discovery." (internal quotations omitted)).  Those doctrines
are inapplicable in this case.  The allegedly tainted evidence at issue—the evidence that the
United States must demonstrate would have been independently or inevitably discovered even
without the unlawful arrest—is Brooks's confession during his interview (not, as the United
States seems to suggest, the location of Schmuck or the shotgun).  The United States has offered
nothing to show that officers would have obtained Brooks's confession inevitably or from
another source but for the arrest.  But because that arrest was supported by probable cause,
Brooks's subsequent statements are not, under *Harris*, subject to exclusion.

proving by a preponderance of the evidence that a defendant's confession is made knowingly and voluntarily. *United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016) (citing *Colorado v. Connelly*, 479 U.S. 157, 168–69 (1986)).

    A.    <u>The Impact of the Pre-*Miranda* Questioning</u>

    Brooks challenges the questioning that occurred during and after his arrest but before he was provided the *Miranda* warning, during which Brooks told officers where to find Schmuck and other information about the April 26th incident. Here, the United States concedes that Brooks was in custody during this initial questioning and "should have been Mirandized before any questions were asked." (ECF No. 47, at 10.)

    The United States does not, however, seek to introduce any statements Brooks made before he was *Mirandized*. Nonetheless, Brooks argues that, "without this initial interrogation, the officers would have never located and seized Mr. Schmuck" and "Mr. Brooks would not have provided any statements." (ECF No. 44, at 5.) Brooks therefore asserts that his post-*Miranda* statements are fruit of the poisonous tree of the prior un-*Mirandized* questioning. (*Id.*)

    As an initial matter, the potential taint of the pre-*Miranda* interrogation on the post-*Miranda* confession is necessarily limited by the facts of this case. No taint could arise from the apprehension of Schmuck based on Brooks's pre-*Miranda* assistance in locating him because Detective Williams and Sergeant Hilliard did not speak to Schmuck before they interviewed Brooks, and thus they did not learn anything from Schmuck that helped them interrogate Brooks. Likewise, no taint could arise from any inculpatory statement Brooks made during his arrest because the arresting officers did not relay any of that information to Detective Williams and

Sergeant Hilliard before the interview.[3]  Instead, Brooks argues that his *Miranda* waiver was ineffectual because he knew he had largely already given up the game—that his confession was "influenced by his knowledge that the officials have already seized certain evidence and information."  (ECF No. 44, at 7 (citing *Shetler*, 665 F.3d at 1157).)  The inculpatory nature of that information is limited as well—as shown in the bodycam videos of the arresting officers, Brooks does little to inculpate himself in the crime other than refer to the "the incident" and ultimately help the officers locate Schmuck.

Regardless, to the extent the pre-*Miranda* questioning could have tainted Brooks's later confession at the stationhouse, the intervening *Miranda* warnings rendered that confession voluntary.  The Sixth Circuit has determined that the effectiveness of such so-called "midstream" *Miranda* warnings is governed by the test formulated by the plurality in *Missouri v. Seibert*, 542 U.S. 600 (2004).[4]  *United States v. Ray*, 803 F.3d 244, 272–73 (6th Cir. 2015).  Under that multi-factor test, "the admissibility of statements given after midstream *Miranda* warnings hinges on whether 'a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, [and whether] the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission.'"  *Id.* (quoting *Seibert*, 542 U.S. at 616).  Relevant factors are (1) "the completeness and detail of the questions and answers in the first round of interrogation," (2) "the overlapping content of the two statements," (3) "the timing and setting of the first and the second [interrogations]," (4) the

---

[3] As such, Brooks's argument that "[c]onfronting a suspect with illegally seized evidence tends to induce a confession by demonstrating the futility of remaining silent" is inapposite here because the interviewers did no such confronting.  (ECF No. 44, at 7 (quoting *United States v. Shetler*, 665 F.3d 1150, 1157 (9th Cir. 2011)).)

[4] Brooks does not cite this standard and instead argues based on the more general attenuation standard.  (*See* ECF No. 44, at 7–9.)

continuity of police personnel," and (5) "the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* at 273 (quoting *Seibert*, 542 U.S. at 616). These factors, however, do not impose "a rigid rule" and should be considered along with "the surrounding circumstances and the entire course of police conduct." *Woolridge*, 64 F.4th at 761 (quoting *Oregon v. Elstad*, 470 U.S. 298, 318 (1985)). Even when the police use improper, coercive tactics, post-warning statements can be admissible if the midstream *Miranda* warning effectively conveys that the defendant could choose to stop talking. *Id.* (citing *Seibert*, 542 U.S. at 612).

These factors largely weigh in favor of admissibility. The first round of interrogation was hardly complete, with the arresting officers focusing almost exclusively on Brooks's knowledge of Schmuck's location, not on Brooks's participation in the alleged crime, and, as a result, the pre- and post-*Miranda* statements do not overlap much. Though the second interrogation took place within an hour or so of the first, the setting and personnel involved were completely different—the arresting officers took Brooks from the Hudson residence to the stationhouse and handed him off to Detective Williams and Sergeant Hilliard. And the video of the stationhouse interview shows that those investigators did not treat the questioning as continuous; they did not acknowledge (and were not even aware of) the prior questioning.

These facts demonstrate that Brooks had a genuine choice to discontinue his cooperation and to refuse to further inculpate himself in the carjacking. Though Brooks's decision may have also been influenced by his knowledge that he had already provided some information to the police, that information consisted of Brooks expressing an awareness of the crime being investigated and providing information about Schmuck's location that led to Schmuck's arrest. A reasonable person in that situation would not have deemed resistance to further interrogation

futile.  The stationhouse interview in this case was simply not the kind of "question-first, *Mirandize*-later tactic" that may trigger suppression.  *See United States v. Ashmore*, 609 F. App'x 306, 317 (6th Cir. 2015).  The effectiveness of Brooks's *Miranda* waiver was not precluded by the prior improper questioning, and his post-waiver statements should be admitted.

      B.    <u>Brooks's Mental State</u>

Brooks argues that his *Miranda* waiver and ensuing confession were not knowing due to his altered mental state and low level of education.  At the time of the interview, Brooks was a habitual drug user (a "full-time junkie"), had used heroin for ten years and fentanyl for the last three, and spent $40 a day on fentanyl.  He told the investigators that he wanted to stop using drugs and that going to jail was part of his plan to do so.  He also told Officer Smith that he had taken fentanyl earlier that day, before his arrest.

"The impact of a defendant's intoxication, like any other factor, is evaluated on a case-by-case basis."  *United States v. Washington*, No. 21-5745, 2022 WL 1224553, at *3 (6th Cir. Apr. 26, 2022) (citing *United States v. Montgomery*, 621 F.3d 568, 571 (6th Cir. 2010)).  "Simply being under the influence during an interview is not nearly enough to overcome a *Miranda* waiver" in the face of "credible testimony establish[ing] that the defendant was otherwise alert, coherent, and lucid during questioning."  *Id.*  "[A] defendant can knowingly and intelligently waive his Miranda rights even while intoxicated if he is 'alert, coherent, and lucid.'"  *United States v. Cummings*, No. 21-cr-20606, 2022 WL 2610429, at *8 (E.D. Mich. July 8, 2022) (citing *United States v. Dunn*, 269 F. App'x 567, 573 (6th Cir. 2008); *United States v. Jones*, 935 F.2d 271 (6th Cir. 1991)).

"In cases involving . . . intoxication, courts most often focus on the perceptions of the involved officers and not the defendant's state of mind, in order to determine whether a

defendant's statement is 'knowing' and 'voluntary.'" *United States v. Hampton*, 572 F. App'x 430, 434 (6th Cir. 2014).  That focus reflects the reality that, "absent state coercion," the admission of a confession does not violate the Constitution.  *Id.* (citing *Connelly*, 479 at 170). Thus, "the important inquiry is whether the interviewing officers perceived there to be any 'impairments' to a knowing and intelligent waiver, when the totality of the circumstances are considered."  *Id.*; *see also Cummings*, 2022 WL 2610429, at *5 ("[T]he court's inquiry into the validity of a *Miranda* waiver is done 'primarily from the perspective of the police, such that where the police had no reason to believe that the defendant misunderstood the warnings, there is no basis for invalidating the *Miranda* waiver.'" (quoting *United States v. Al-Cholan*, 610 F.3d 945, 954 (6th Cir. 2010)) (alterations omitted)).

Brooks maintains that he was not sober and did not possess the mental capacity to knowingly waive his *Miranda* rights.  As evidence, Brooks points to his status as a long-term addict, to his statement to Officer Smith that he had taken a hit that morning, to Officer Smith's testimony that Brooks did not seem lucid, to Brooks's occasional pauses and slurred or stumbled speech during the interview, to Brooks's low level of education and admission that he did not know what "coercion" meant, and to the fact that none of the officers asked Brooks if he was currently intoxicated.  The United States, on the other hand, sees Brooks's pauses as contemplation, his request to define "coercion" and other questions as evidence of his careful consideration, and his extensive criminal record as providing him familiarity with the criminal justice system and his rights.  The United States also notes that Brooks was cutting someone's hair when the police arrived, indicating his alertness.

The investigators who obtained Brooks's *Miranda* waiver—Detective Williams and Sergeant Hilliard—both testified that Brooks seemed calm, alert, and sober.  They testified that

Brooks did not appear impaired or intoxicated and appeared to understand what was happening. Detective Williams is an experienced interviewer and testified that it is normal for suspects to contemplate and go back-and-forth on whether to share their story. He also testified that he deals with intoxicated people and is aware of the signs of intoxication, which he did not see in Brooks.

The investigators' testimony is credible and is borne out by the video of the interview. Brooks was responsive to the investigators' questions and repeatedly indicated that he understood what he was being told and asked. Brooks initially resisted telling the investigators the details of the carjacking and said that he was going to jail anyway, but after additional discussion and executing the *Miranda* waiver, he changed his mind. Brooks was able to provide his personal information and history and discuss his family members. Brooks was easily able to read the *Miranda* waiver form, though his speech was a bit muddled. He told the investigators that he understood the form and had no questions. When Detective Williams asked Brooks if he knew what "coercion" means, Brooks said no and then confirmed that he understood the definition Detective Williams provided. Before signing the *Miranda* waiver, Brooks hesitated for about fifteen seconds, saying "oh man, man, man," indicating that he was aware of the gravity of his situation. Brooks then provided details of his drug use, his plan to go to jail to get clean, and the carjacking. Though Brooks sat hunched over and spoke quietly, he was consistently communicative and responded appropriately to the investigators' questions.

Officer Smith testified, on the other hand, that Brooks did not seem lucid during their interaction and was only somewhat alert and aware of what was going on. However, Officer Smith's interaction with Brooks took place from approximately 10:06 to 10:13, whereas the stationhouse interview of Brooks began at approximately 11:27. Over an hour had passed, and perhaps the effects of the fentanyl he took earlier that day may have dissipated. In any event,

based on the video evidence, Brooks does indeed appear more alert and lucid during the interview at the stationhouse than during the questioning at the Hudson residence. Because the relevant inquiry is Brooks's state of mind at the time he executed the *Miranda* waiver, the somewhat conflicting testimony of Officer Smith does not call into question the credibility of Detective Williams and Sergeant Hilliard.

Based on the credible testimony of Detective Williams and Sergeant Hilliard and on the video evidence, the totality of the circumstances indicates that Brooks was sufficiently coherent and lucid to knowingly and intelligently waive his *Miranda* rights. Though Brooks had admitted to taking fentanyl earlier that day, though Officer Smith testified that Brooks did not seem lucid at the time of his arrest, and though Detective Williams and Sergeant Hilliard did not ask Brooks if he was intoxicated, Detective Williams and Sergeant Hilliard had no reason to believe that Brooks was impaired or misunderstood the *Miranda* waiver in light of his alert, coherent affect. *See, e.g.*, *Hampton*, 572 F. App'x at 434–35 (finding a knowing waiver though the defendant had not slept for over twenty-eight hours and had consumed alcohol earlier that day, where the officers testified he was coherent and understood everything); *United States v. Hayek*, No. 2:18-cr-160, 2021 WL 2856527, at *3 (E.D. Tenn. July 8, 2021) ("On the tape, defendant is heard as engaged and articulate during the exchange as well as throughout the interview. Therefore, even if defendant was intoxicated at the time, as he contends, there is no evidence that he could not understand his rights or that he was waiving them.").

Brooks's education level does nothing to change that conclusion. He has a ninth-grade education, was easily able to read the *Miranda* waiver form, and was easily able to communicate with and understand the investigators and his rights. *See, e.g.*, *Hampton*, 572 F. App'x at 435 (finding a knowing and intelligent waiver where the defendant was thirty-two years old, could

24

read and write, had a tenth-grade education, and was familiar with the criminal justice system).
The United States has met its burden of proving by a preponderance of the evidence that
Brooks's waiver was knowing.

> C.    The Coerciveness of the Officers' Conduct

Brooks further argues that his confession was involuntary because it was coerced by the
officers' illusory promises.  A confession is involuntary due to police coercion if: "(i) the police
activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the
defendant's will; (iii) and the alleged police misconduct was the crucial motivating factor in the
defendant's decision to offer the statements."  *Binford*, 818 F.3d at 271 (quoting *United States v.
Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)).

First, the officers were not objectively coercive in this case.  "While it is true that in some
situations, 'police promises of leniency can be objectively coercive,' generally, such promises
are coercive only 'if they are broken or illusory,' and 'promises to recommend leniency and
speculation that cooperation will have a positive effect do not make subsequent statements
involuntary.'"  *Binford*, 818 F.3d at 271 (quoting *United States v. Johnson*, 351 F.3d 254, 261–
62 (6th Cir. 2003); *United States v. Delaney*, 443 F. App'x 122, 129 (6th Cir. 2011)) (alterations
omitted).  Here, Brooks identifies two general categories of promises he says are illusory: first,
"that speaking with officers would make a difference regarding whether he would be charged
with theft or carjacking," and second, that "it would be good for him to help locate Mr.
Schmuck."  (ECF No. 44, at 11.)

As to the first category, nothing indicates these statements were untrue or illusory.  The
investigators undoubtedly based their charging decision (theft or carjacking) on the information
Brooks provided, and all of the officers were direct with Brooks that he was going to jail

regardless of whether he cooperated.  As to the second category, these statements are not promises at all.  "[A]n illusory promise is a statement in the form of a promise, but lacking its substance in that it does not actually commit the police to undertake or refrain from any particular course of action."  *Johnson*, 351 F.3d at 262 n.1.  The general statements that things would go better for Brooks if he provided Schmuck's location do not identify any particular act required of the police if Brooks complied.  No objectively reasonable person would understand these vague statements to bind the police to anything.  *See United States v. Shields*, No. 5:16-085-DCR, 2016 WL 7407709, at *4 (E.D. Ky. Dec. 22, 2016) ("Generalized statements that cooperation is in a defendant's best interest . . . do not rise to the level of a coercive *quid pro quo* promise that a defendant will receive something concrete in exchange for cooperation." (citing *United States v. Stokes*, 631 F.3d 802, 809 (6th Cir. 2011))).  As such, the statements are not objectively coercive.

Second, the level of coercion was not sufficient to overbear Brooks's will.  Brooks argues that these promises were more believable to him due to "his altered mental state."  (ECF No. 44, at 11.)  "Evidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary."  *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989) (*citing, e.g.*, *Connelly*, 479 U.S. 157).  However, "a lesser quantum of coercion is required where the suspect is intoxicated and the officers are aware of his intoxication."  *Cummings*, 2022 WL 2610429, at *5 (quoting *United States v. Cooper*, No. 7:16-01-DCR, 2016 WL 2944661, at *5 (E.D. Ky. May 20, 2016)).  Here, as discussed, Brooks experienced little-to-no coercion and exhibited little-to-no signs of intoxication when he executed the waiver.  The totality of the

circumstances thus indicates that police misconduct did not overwhelm Brooks or force him to waive his rights against his will.

Third, the alleged police misconduct was not the crucial motivating factor in Brooks's decision to offer the statements. Even assuming Brooks experienced coercion, an intervening *Miranda* warning can mitigate prior coercive conduct and render an ensuing confession voluntary. *See Woolridge*, 64 F.4th at 761 (citing *Seibert*, 542 U.S. at 612). Here, Brooks read and understood the *Miranda* waiver form. When Detective Williams provided a definition of "coercion," Brooks again confirmed his understanding. Brooks hesitated before finally signing the waiver, saying "oh man, man, man," which indicates he was genuinely considering whether to sign and weighing his options. After Detective Williams explained that he could stop answering questions at any time, Brooks agreed to tell his "story" and signed the form. These facts indicate that Brooks's waiver was voluntary and not motivated by misconduct. The United States has met its burden of proving by a preponderance of the evidence that Brooks's waiver was voluntary.

## **RECOMMENDATION**

For the foregoing reasons, this Court recommends the motion to suppress be denied.

Respectfully submitted this 17th day of October, 2023.

s/Annie T. Christoff
ANNIE T. CHRISTOFF
UNITED STATES MAGISTRATE JUDGE

## **NOTICE**

Within fourteen (14) days after being served with a copy of this report and recommendation, a party may serve and file written objections to the proposed findings and recommendations. Fed. R. Crim. P. 59(b)(2). A party may respond to another party's objections within fourteen

(14) days after being served with a copy.  Failure to file objections within fourteen (14) days may constitute waiver of objections, exceptions, and further appeal.