IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                          Case No. 2:23-cr-20037-MSN

RODNEY BROOKS,

    Defendant.

---

**ORDER ADOPTING IN PART REPORT AND RECOMMENDATIONS (ECF NO. 52) AND DENYING DEFENDANT'S MOTION TO SUPPRESS**

---

Before the Court is Defendant's Motion to Suppress Evidence and Supporting Memorandum ("Motion," ECF No. 30), to which the Government responded on May 18, 2023 (ECF No. 35). Defendant's Motion was referred to the United States Magistrate Judge for report and recommendation. (ECF No. 31.) The Magistrate Judge issued her Report and Recommendation ("Report") on October 17, 2023 (ECF No. 52), to which Defendant objected (ECF No. 55). The Government did not object to the Report but did file a response to Defendant's objections. (ECF No. 56.) For the reasons set forth below, Defendant's objection as to the legality of his arrest is **SUSTAINED**, his remaining objections are **OVERRULED**, and Defendant's Motion is **DENIED**.

## BACKGROUND

On February 23, 2023, Defendant was indicted on one count of knowingly possessing a firearm while having previously been convicted of a crime punishable by imprisonment for a term exceeding one year under 18 U.S.C. § 922(g)(1) and one count of knowingly possessing a stolen

firearm under 18 U.S.C. § 922(j).  (ECF No. 1 at PageID 1–2.)  Defendant filed the Motion now before the Court on May 5, 2023, asking the Court to "suppress the statements he made during his detention . . . ."  (ECF No. 30 at PageID 52.)

On July 7, 2023, the Magistrate Judge conducted a hearing on Defendant's Motion at which she heard testimony from one Government witness (Detective Gary Williams[1]) and three Defense witnesses (Officer Malcolm DeWitt Smith Jr., Officer Russell Cathey, and Sergeant Richard Hilliard[2]). (ECF No. 52 at PageID 141.)  In addition, the Government introduced two exhibits (video of the interview and an advice-of-rights form) and the Defense introduced three (two video files from body-worn camera footage and a policy statement from MPD).  (*Id.*)  Parties also filed supplemental briefs after the hearing based on new theories Defendant raised at the hearing.  (*See* ECF No. 52 at PageID 145 and ECF Nos. 44, 47, and 48.)

On October 17, 2023, the Magistrate Judge entered her Report recommending that Defendant's Motion be denied.  (ECF No. 52 at PageID 142.)  Defendant objected to the Report's proposed conclusions of law that found Defendant's arrest legal and his statements admissible. (ECF No. 55.)  The Government responded to Defendant's objections on May 30, 2023.  (ECF No. 56.)

### STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Criminal Procedure 59, a district court may refer a motion to suppress to a magistrate judge for the preparation of a report and

---

[1] Detective Williams is a Detective with the Memphis Police Department ("MPD") currently assigned to the violent crimes unit. (ECF No. 52 at PageID 145.)  He participated in the station house interview of Defendant.  (*Id.*)

[2] Officers Smith and Cathey are members of the Tillman Station taskforce with the MPD and served as the arresting officers in this case. (ECF No. 52 at PageID 142.)  Sergeant Hilliard is also with the MPD and participated in the station house interview of Defendant with Detective Williams. (*Id.* at PageID 145.)

recommendation.  "The magistrate judge must promptly conduct the required proceedings [and] enter on the record a recommendation for disposing of the matter, including any proposed findings of fact."  Fed. R. Crim. P. 59(b)(1).  If a party files timely objections to the recommendation, the district court must consider those objections *de novo* and "accept, reject, or modify the recommendation."  Fed. R. Crim. P. 59(b)(3).  Failure to object to a magistrate judge's findings or conclusions results in waiver of those objections.  Fed. R. Crim. P. 59(b)(2).

"The filing of objections to a magistrate [judge]'s report enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute."  *Thomas v. Arn*, 474 U.S. 140, 147 (1985).  Therefore, objections to a magistrate judge's report must be "specific."  Fed. R. Crim. P. 59(b)(2).  Vague, general, or conclusory objections are improper, will not be considered by the reviewing court, and are "tantamount to a complete failure to object."  *Cole v. Yukins*, 7 F. App'x 354, 356 (6th Cir. 2001); *see also Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995) ("[A] general objection to a magistrate [judge]'s report, which fails to specify the issues of contention, does not satisfy the requirement that an objection be filed.  The objections must be clear enough to enable the district court to discern those issues that are dispositive and contentious."); *Aldrich v. Bock*, 327 F. Supp. 2d 743, 747 (E.D. Mich. 2004) ("An 'objection' that does nothing more than state a disagreement with a magistrate [judge]'s suggested resolution, or simply summarizes what has been presented before, is not an 'objection' as that term is used in this context.")  The Court need not review—under a *de novo* or any other standard—those aspects of a report and recommendation to which no objection is made.  *Thomas*, 474 U.S. at 150–52.

**FINDINGS OF FACT**

Neither party objected to the Report's proposed findings of fact. (ECF No. 154 at PageID 428–34).³ The Court therefore **ADOPTS** and incorporates those proposed findings of fact.

**DISCUSSION**

As summarized by the Magistrate Judge, Defendant moved to suppress the statements he made during his interview at the police station on the grounds that they "are the fruits of an illegal arrest, the fruits of a prior involuntary interrogation, involuntary based on [Defendant's] mental state, and the product of coercive and illusory promises." (ECF No. 52 at PageID 151.)

**I.    The Arrest**

The Report first rejected the Government's contention that Defendant lacked standing to challenge his arrest because there was no evidence he was anything other than a "transient visitor" at the home in whose curtilage he was arrested, meaning he had no expectation of privacy there. (*Id.* at PageID 153.) Rather, the Report relied on evidence filed after the suppression hearing that indicated Defendant did have a sufficiently reasonable expectation of privacy under the relevant case law. (*Id.*) Since the Government did not object to that evidence and has not objected to the Report, the Court reviews these proposed conclusions of law for clear error and finds none.

In light of the Report's proposed findings that Defendant's arrest was made without a warrant at a location at which Defendant had a reasonable expectation of privacy, the Report proceeds to discuss whether that presumptively unconstitutional arrest requires suppression of the statements he made afterwards. (*Id.* at PageID 154.) To that end, the Report first turned to *New York v. Harris*, 495 U.S. 14 (1990), on which the Government relied. (*Id.*) In *Harris*, police

---

³ Defendant wished to add, however, that the detached garage where Defendant was arrested was "surrounded by a fence." (ECF No. 55 at PageID 169.)

arrived at Mr. Harris's home to take him into custody because they had probable cause to believe he had murdered a woman found dead in her apartment. *Harris*, 495 U.S. at 15. Police did not have a warrant for his arrest at this time. *Id.* After Mr. Harris let them in to his residence, the officers read him his *Miranda* rights, which Mr. Harris acknowledged he understood. *Id.* at 16. Mr. Harris then admitted to the killing. *Id.* Police proceeded to arrest Mr. Harris, take him to the police station, and read him his *Miranda* rights a second time. *Id.* Mr. Harris signed a written inculpatory statement afterwards. *Id.* Police then read Mr. Harris his *Miranda* rights for a third time and, despite his wish to end the interrogation, Mr. Harris sat for a videotaped interview with a district attorney that further incriminated him. *Id.*

Since the parties in *Harris* appeared to acknowledge that Mr. Harris's statements at his residence and during the videotaped interview were inadmissible, the only issue for the Court was:

> [W]hether [Mr.] Harris's second statement—the written statement made at the station house—should have been suppressed because the police, by entering [Mr.] Harris's home without a warrant and without his consent, violated *Payton v. New York*, 445 U.S. 573 (1980), which held that the Fourth Amendment prohibits the police from effecting a warrantless and nonconsensual[4] entry into a suspect's home in order to make a routine felony arrest.

*Id.* The Court answered that Mr. Harris's station house statement should not have been suppressed "because the rule in Payton was designed to protect the physical integrity of the home; it was not intended to grant criminal suspects, like [Mr.] Harris, protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime." *Id.* at 17. Thus, "[b]ecause the officers had probable cause to arrest [Mr.] Harris for a crime, [Mr.] Harris was not unlawfully in custody when he was removed to the station house, given Miranda warnings, and allowed to talk. *Id.* at 18.

---

[4] Though the Court in *Harris* stated that Mr. Harris "let" police enter his residence, it accepted the lower courts' findings that Mr. Harris did not consent to police officers' entry. *See Harris*, 495 U.S. at 17.

Here, the Report found *Harris* "directly applicable in this case," as Defendant did not dispute that officers had probable cause to arrest Defendant. (ECF No. 52 at PageID 156–57.) Given the similarities between the facts of this case and those of *Harris*, the Report ultimately concluded that Defendant's "arrest was legal and did not render the subsequent stationhouse statements impermissible fruit." (*Id.* at PageID 157.) Significantly, the Report distinguishes between the arrest, which it says was legal, and the entry into the home, which it says was not. (*Id.* at PageID 155–56 n.1.) According to the Report, "the arrest of [Defendant] was not illegal, and the station house statements were the fruit of that arrest, not of the illegal entry into the home . . . ." (*Id.*)

Defendant objects to the Report's conclusion that Defendant's arrest was "legal," arguing that the *Harris* Court found arrests such as Mr. Harris's to violate the Fourth Amendment. (ECF No. 55 at PageID 170.) Rather than distinguish between the arrest and the illegal entry, as the Report does, Defendant contends that the more appropriate distinction is between Mr. Harris's arrest, which was unlawful, and his continued custody, which was not. (*Id.* at PageID 171.) The Government does not respond to this objection. (*See* ECF No. 56.)

The Court finds Defendant's objection well-taken and it is thus **SUSTAINED**. The Court agrees with the Report that Defendant's station house confession was not the fruit of the illegal entry. *See Harris*, 495 U.S. at 19 (explaining that Mr. Harris's statement at the station was not "the fruit of having been arrested in the home rather than someplace else"). But the Court differs with the Report's statement that the confession was the fruit of a legal arrest. (*See* ECF No. 52 at PageID 156 n.1.) *Harris* is admittedly imprecise on this issue, but it contains several indications that the arrest was, as Defendant contends, unlawful. Defendant cites *Harris*'s indication that "arresting [Mr.] Harris in his home without an arrest warrant violated the Fourth Amendment."

6

*Harris*, 495 U.S. at 17. The Court similarly thinks the most natural reading of this sentence is that the arrest was not legal, albeit illegal only because of the location at which it took place and the absence of consent or extenuating circumstances. The Court also finds suggestive the *Harris* Court's comparison of its facts to other cases "that began with an illegal arrest" and its later conclusion that "suppressing the statement taken outside the house would not serve the purpose of the rule that made Harris's in-house arrest illegal." *Id.* at 17, 20. The *Harris* Court also found the facts of *Harris* "analogous" to *United States v. Crews*, 445 U.S. 463 (1980), which the Court summarized as having "refused to suppress a victim's incourt identification despite the defendant's illegal arrest." *Id.* at 19. Courts have reached a similar conclusion. *See, e.g., United States v. Wells*, 690 F. App'x 338, 344 (6th Cir. 2017) (summarizing *Harris* as "emphasiz[ing] that the officers did have probable cause to arrest the defendant, and therefore while his *arrest* inside his house without a warrant was unlawful, his continued *detention* was not).

Having considered the Report, Defendant's objections, and *Harris*, the Court thinks the most accurate reading of *Harris* is that the station house confession is admissible because, since it is undisputed officers had probable cause to arrest Defendant, it is the fruit of Defendant's *lawful custody* after the illegal arrest and illegal entry. At the end of the day, though, this ruling is somewhat of a Pyrrhic victory for Defendant. As even he acknowledges in raising this objection, (*see* ECF No. 55 at PageID 171), *Harris's* holding supports the Report's conclusion that Defendant's statements at the police station following his arrest—lawful or not—need not be suppressed.

## II. The Prior Interrogation

Defendant also moved to suppress his statements on the basis that he would not have made any statements at the police station absent his initial questioning by police during and after his

arrest, at which time he was un-*Mirandized*.[5] (ECF No. 52 at PageID 158.) Thus, he argues that his station house statements were fruit of the poisonous tree of his un-*Mirandized* statements.

The Report first noted that the facts in this case did not suggest any taint that could have arisen from the initial questioning of Defendant; the station house interrogators were not told about Defendant's statements made prior to his arrival at the station, nor had they spoken to the suspect Defendant helped officers locate during that time (Mr. Schmuck). (*Id.* at PageID 158–59.) The Report also disagreed with Defendant's argument that his *Miranda* waiver was ineffectual because he believed he had already inculpated himself through his prior statements. (*Id.* at PageID 159.) In the Magistrate Judge's view, Defendant's prior statements were not all that inculpatory apart from his reference to "the incident" and his assistance in locating Mr. Schmuck. (*Id.*)

Regardless, the Report concluded that the "midstream" *Miranda* warnings given at the station rendered Defendant's confession there voluntary. (*Id.*) Applying the factors set forth in *Missouri v. Seibert*, 542 U.S. 600 (2004), the Report proposed finding that Defendant's statements at the station were admissible. (*Id.* at PageID 160.) Among the considerations leading to this conclusion were the facts that the separate interrogations did not overlap substantively, took place at different locations, and were conducted by different individuals. (*Id.*) The Magistrate Judge also found significant that the station interrogators did not acknowledge the previous questioning (since they were unaware of it). (*Id.*)

Defendant objects to the Report's conclusion that Defendant's pre-*Mirandized* statements were not especially inculpatory. (ECF No. 55 at PageID 171, 173–74.) In addition to the statements referenced in the Report, Defendant reminds the Court that when asked where Mr.

---

[5] The Government concedes that police should have *Mirandized* Defendant during this time but does not seek to admit any of his statements from this period. (ECF No. 52 at PageID 158.)

8

Schmuck was, he responded that he had not seen Mr. Schmuck since a couple days after "the incident that I guess that's what y'all have got me for." (*Id.* at PageID 173.) He also points to his question to Officer Cathey concerning whether he would be charged or not. (*Id.*) According to Defendant, the aforementioned examples illustrate that the arresting officers' questioning of him prior to being taken to the station did elicit inculpatory statements and constituted the kind of "psychological ploy of 'positing the guilt' of a suspect" that the Supreme Court expressed concerns about in *Miranda* and *Rhode Island v. Innis*, 446 U.S. 291, 299 (1980). (*Id.* at PageID 174.) Accordingly, he says Defendant should have been *Mirandized* prior to any questioning and asks the Court "to reject the [M]agistrate [J]udge's legal conclusions regarding the impact of the pre-*Miranda* questioning." (*Id.*)

Relatedly, Defendant objects to the Report's conclusion that the midstream *Miranda* warnings cured the arresting officers' failure to *Mirandize* Defendant prior to bringing him to the station. (ECF No. 55 at PageID 171, 173–74.) He asserts that "a reasonable person in [Defendant's] shoes would not have understood the *Miranda* warnings delivered at the station house to convey a message that he retained a choice about continuing to talk." (*Id.* at PageID 176.) Regarding the relevant factors, Defendant argues that the initial questioning was sufficiently complete and detailed to elicit all officers needed to establish probable cause that Defendant possessed a firearm. (*Id.*) For that reason, he also disagrees that the different questionings did not overlap. (*Id.*) As for the fact that the second set of interrogators were unaware of the initial questioning, Defendant asserts that all that matters is that *he* knew about the first confession, and that it was reasonable to think invoking his *Miranda* rights would be futile given that knowledge. (*Id.*) Finally, he contends that the station house interrogation was continuous with the pre-*Mirandized* questioning because the initial questioning involved "the incident" just as the

9

*Mirandized* questioning did.  (*Id.* at PageID 177.)  The only factor he concedes weighs against exclusion is that involving the continuity of personnel during the interrogations.  (*Id.*)

This Court, like the Magistrate Judge and the Government, is in agreement with Defendant that the arresting officers should have *Mirandized* Defendant prior to asking him any questions.  Accordingly, the issue is whether the subsequent *Miranda* warnings cured any taint of the initial questioning on the station confession.  The Court finds Defendant's argument that the Report perhaps understates the inculpatory nature of his prior statements well-taken, meaning that this Court finds the station house confession slightly more tainted by the initial questioning than did the Magistrate Judge.  But Defendant ultimately gains little by this acknowledgement because the Court nonetheless agrees with the Report's proposed conclusion that the midstream *Miranda* warnings rendered Defendant's station confession voluntary notwithstanding the pre-*Miranda* questioning.  (*See* ECF No. 52 at PageID 159.)

As the Report and parties explain, a plurality of the Court in *Seibert* set forth various factors (adopted by the Sixth Circuit) "that bear on whether Miranda warnings delivered midstream could be effective enough to accomplish their object."  *Seibert*, 542 U.S. at 615.  *See also United States v. Ray*, 803 F.3d 244, 272 (6th Cir. 2015).  Those factors are:

> [T]he completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second [interrogations], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Seibert*, 542 U.S. at 615.  The Court generally agrees with the Report's application of these factors to Defendant's case and adds a few points.  First, the facts of this matter do not indicate that the initial questioning was detailed or complete.  The facts in the Report indicate that Officer Smith asked Defendant two questions during his five- to seven-minute interaction with him: (1) "Where Casey at, man?" and (2) whether Defendant had a hit that day, to which Defendant responded

10

"yes." (ECF No. 52 at PageID 143.) The second question has nothing to do with the conduct charged in this case. And while Defendant responded to the first question with inculpatory information, the Court does not agree with Defendant's suggestion that Officer Smith should have known that it would elicit it. The most natural answer to that question would, in the Court's view, involve information about Mr. Schmuck's whereabouts, or else indicate a lack of knowledge about the subject. Officer Cathey's interaction with Defendant lasted longer than Officer Smith's, but his questions and statements similarly revolved around the location of Mr. Schmuck rather than "the incident." Officer Cathey did respond to Defendant during their time together that he and Mr. Schmuck would get charged, but he then said he did not want to discuss "the incident" with Defendant because he had not read him his *Miranda* rights. (*Id.* at PageID 144.)

Second, the Court agrees with the Report that the separate questionings did not overlap in its content. To be sure, there was reference to "the incident" in both. In its supplemental response, the Government also refers to overlapping discussions about the victim's girlfriend. (ECF No. 47 at PageID 126.) But it is clear from the facts that the arresting officers' questioning focused on the location of Mr. Schmuck rather than the facts of "the incident" underlying Defendant's charges in this matter. To the extent "the incident" was mentioned, it was Defendant who brought it up, and the Court has already discussed that his doing so was not responsive to the question posed. In contrast, Detective Williams and Sergeant Hilliard interrogated Defendant at the station about the April 26th incident. (ECF No. 52 at PageID 146.) Interrogators and Defendant discussed Mr. Schmuck during this interview, but not in the context of his current whereabouts, which is the information the arresting officers were attempting to uncover.

Third, while the period between the two questionings was relatively short—only one hour—the settings were very different and involved an entirely new set of questioners. Finally,

11

the facts do not support Defendant's contention that the station house interrogators treated their questioning as continuous with that of the arresting officers. Of course, those interrogators were unaware of the initial questioning. (*Id.* at PageID 145.) Further, the focus of their interrogation was, as previously discussed, different from that of the arresting officers' questions. The Court agrees with the Report's conclusion that "[t]he stationhouse interview in this case was simply not the kind of 'question-first, *Mirandize*-later tactic' that may trigger suppression." (ECF No. 52 at PageID 161 (quoting *United States v. Ashmore*, 609 F. App'x 306, 317 (6th Cir. 2015)).)

### III.  Claims Involving Defendant's Mental State, Coercion, and Illusory Promises

Defendant also moved to suppress his statements on the grounds that they were involuntary based on [Defendant's] mental state and the product of coercive and illusory promises. (ECF No. 52 at PageID 151.) The Court agrees with the Report's analysis concerning Defendant's mental state and its significance to the knowing and intelligent nature of his *Miranda* waiver. It also agrees with the proposed conclusions concerning Defendant's argument that his confession was involuntary because coerced by illusory promises. As neither party objected to these portions of the Report, the Court reviews them for clear error and finds none.

### CONCLUSION

For the reasons set forth above, the Report (ECF No. 52) is **ADOPTED** in part. Defendant's objection as to the legality of Defendant's arrest is **SUSTAINED** and his remaining objections are **OVERRULED**. Defendant's Motion to Suppress (ECF No. 30) is **DENIED**.

**IT IS SO ORDERED**, this 2nd day of February, 2024.

*s/ Mark S. Norris*
MARK S. NORRIS
UNITED STATES DISTRICT JUDGE